**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<table>
<tr><td>

**ESTATE OF ELLIOTT NAYTHAN FUNKHOUSER, SR., by and through DIANE MARIE FUNKHOUSER, Administrator of the Estate of Elliott N:aythan Funkhouser, Sr.**,

*Plaintiff,*

v.

**DELAWARE COUNTY, et al.**,

*Defendants.*

</td><td>

**Case No. 2:24-cv-01091-JDW**

</td></tr>
</table>

**ORDER**

**AND NOW**, this 21st day of February, 2025, upon consideration of Defendant, The GEO Group, Inc.'s, Motion To Dismiss Plaintiff's Second Amended Complaint (ECF No. 83) and the Wellpath Defendants' Motion To Extend Automatic Stay To Wellpath, LLC's Employees (ECF No. 92), I note as follows.

**GEO's Motion To Dismiss**

1.    A district court may dismiss a complaint where the plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "On a motion to dismiss, a court must 'accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.'" *Doe v. Princeton University*, 30 F.4th 335, 340 (3d Cir. 2022) (citation omitted). To survive, a complaint must contain "sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

2.      "[A] § 1983 claim against a municipality may proceed in two ways. A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his … injuries, or that they were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice[.]'" *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citations and quotations omitted). The Estate of Elliott Naythan Funkhouser, Sr. asserts both types of claims against The GEO Group, Inc., which operated the George Hill Correctional Facility (the "Facility") until April 6, 2022.[1] To plead either type of claim against GEO, the Estate must allege a constitutional violation.

3.      "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). A pre-trial detainee "has a liberty interest in his … personal security and … a due process violation occurs when a detainee is injured by a fellow detainee as a result of a custodian's 'deliberate or reckless indifference' to the

---

[1]      For purposes of this motion, there is no dispute that GEO was acting in place of the municipality (Delaware County) when it controlled operations at the Facility.

victim's safety." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1024 (3d Cir. 1991) (quotation omitted). "To be liable on a deliberate indifference claim, a defendant prison official must both 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety.'" *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (quotation omitted).

4.      "A prisoner has a valid failure-to-protect claim if the prison official shows 'deliberate indifference' to a substantial risk of serious harm to an inmate." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014)) (quotation omitted). In addition, "it is possible for a municipality to be held independently liable for a substantive due process violation even when none of its individual employees is liable." *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006).

5.      The Estate alleges that when Shad Murray Boccella arrived at the Facility on February 9, 2022, "the medical division of the Geo Group did an 'Intake Screening' of Boccella identifying him as a 'risk of assault on staff or other inmates.'" (ECF No. 56 at ¶ 53.) At that time, GEO had a duty to protect the inmates in its custody. Nevertheless, no one from GEO documented the risk Mr. Boccella posed to other inmates in a centralized system or otherwise shared this information with the prison staff responsible for inmate housing assignments. These allegations suffice to state a claim that GEO was deliberately indifferent to the constitutional rights of the inmates in its custody, including Mr. Funkhouser.

6.      The Estate has also included sufficient allegations to support a failure to train claim.[2] As GEO acknowledges, "'in certain situations, the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights' even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223. While the Estate has not alleged a pattern of similar constitutional violations prior to Mr. Funkhouser's death, the Estate has alleged a plausible failure to train claim based on a single incident. Indeed, given the inherent conditions in a prison setting[3], the need to train prison employees to "identify, record and communicate to the proper personnel an inmate's threat to other inmates" is obvious, at least at the pleading stage. (ECF No. 56 at ¶ 110.)[4] Thus, the Estate may proceed with its failure to train claim based on a single-incident theory.

---

[2]     Pursuant to my Policies and Procedures, before a defendant moves to dismiss a complaint, I require the Parties to submit a joint letter setting forth each substantive issue to be raised in the motion and each Party's position with respect to those issues. In the Parties' joint letter dated October 24, 2024, GEO did not address the Estate's failure to train claim. Following a call with the Parties regarding their respective positions on the issues, I entered an Order which stated that in the event GEO moved to dismiss the Second Amended Complaint, "it must confine its arguments to those it set forth in its pre-motion letter to me, dated October 24, 2024." (ECF No. 74 at ¶ 3.) GEO did not comply with my Order. Instead, in its Motion To Dismiss, GEO raised arguments relating to the Estate's failure to train claim. Thus, I could deny GEO's motion as to that claim on this basis. However, because the Estate responded to GEO's arguments, I will address them as well.

[3]     Indeed, GEO concedes that posing "[a] general risk of violence ... could describe more than half of the inmate population[.]" (ECF No. 83-1 at 12.)

[4]     The Estate also alleges that GEO "failed to train [its] staff in any regard whatsoever concerning the risk posed by mentally unstable and/or violent inmates[.]" (ECF No. 56 at ¶ 160.)

7.      However, the Estate has failed to plead a plausible claim for municipal liability against GEO based on an alleged unconstitutional policy or custom. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (superseded by statute on other grounds) (quotations omitted). The Estate has not identified any GEO policy that it contends led to Mr. Funkhouser's death. On the contrary, the Second Amended Complaint is replete with allegations that GEO failed to implement policies to protect inmates from one another. At best, the Estate alleges that GEO "developed and maintained a number of deficient policies and/or customs which ... were a direct and proximate cause of the constitutional harm, injuries and death suffered by Elliott Funkhouser ...." (ECF No. 56 at ¶ 213.) But that allegation is no more than a conclusory recitation of the elements of a *Monell* claim, rendering it insufficient to state a claim for relief. *See, e.g., McTernan v. City of York, PA*, 564 F.3d 636, 659 (3d Cir. 2009).

8.      The Estate also includes an allegation that GEO had a "policy and custom of accepting the admission of additional detainees when the inmate population exceeds the prison's capacity to properly house the inmates," (ECF No. 56 at ¶ 211), but there are no other facts set forth in the Second Amended Complaint that tie that alleged policy or

custom to Mr. Funkhouser's death. For example, there are no allegations that the Facility was overcrowded while GEO operated the Facility, that GEO (as opposed to Delaware County after it took over the prison) admitted too many inmates, or how any alleged overcrowding that occurred on GEO's watch led to Mr. Funkhouser's death. At most, the Estate alleges that at the time he was transferred to block 10A, "there was no safe cell space" on that particular block. (ECF No. 56 at ¶ 124.) This lone allegation is insufficient because there are no other facts in the Second Amended Complaint that make it plausible that the lack of cell space on the mental health block was the result of GEO admitting too many inmates pursuant to a policy or custom.

9.      The Estate has alleged that GEO had a custom of failing to enforce certain policies relating to inmate safety, but a *Monell* claim based on this alleged custom—which sounds in deliberate indifference[5]—is not plausible without allegations of past constitutional violations. "To allege a custom, a plaintiff typically must demonstrate that there was a pattern of similar constitutional violations." *Diaz v. City of Philadelphia*, 670 F. Supp. 3d 174, 181 (E.D. Pa. 2023). The Estate alleges that GEO had a custom of failing to enforce its policies that required staff to (a) conduct weekly threat assessments of inmates housed on mental health block 10A[6] and (b) complete reports in the event of an

---

[5]      *See, e.g., Forrest*, 930 F.3d at 107.

[6]      The Estate alleges that no one from GEO conducted weekly threat assessments of Mr. Boccella, who was housed on block 10A. Instead, it alleges that after assessing Mr. Boccella during his intake on February 9, 2022, it never assessed him again.

"incident."[7] But there are no allegations of prior disregard of these policies that would have put GEO on notice of the risk of constitutional violations. That is a problem, because "the presence of past violations, or lack thereof, is frequently the fulcrum point for custom ... cases." *Donahue v. Borough of Collingdale*, 714 F. Supp.3d 504, 521 (E.D. Pa. 2024). That is true here. Absent any supporting facts that the failure to enforce these policies led to prior constitutional violations, the Estate has failed to allege that GEO was deliberately indifferent to a known risk. Thus, the Estate cannot state a plausible *Monell* claim based on this alleged custom.

10.    GEO's arguments regarding causation miss the mark. The Estate seeks to hold GEO liable for its conduct while it operated the Facility and owed constitutional duties to inmates like Mr. Funkhouser. That the consequences of that conduct occurred after GEO left does not immunize GEO as a matter of law. GEO has not cited a single case that stands for that proposition, and I could not find one. On the contrary, the available case law[8] indicates that whether GEO can be held liable will not turn on whether Mr. Funkhouser was in GEO's custody on the day he died. *See, e.g.*, *Summers v. City of Philadelphia*, No. 17-cv-191, 2017 WL 2734277, at *4 (E.D. Pa. June 26, 2017). "Instead,

---

[7]    The Estate contends that GEO had a policy requiring staff to fill-out an incident report "[i]n the event of an incident or event requiring an incident report," but it does not identify what type of conduct warrants a report, per GEO's policy. (ECF No. 56 at ¶ 77.) The Second Amended Complaint assumes, without any supporting facts, that someone should have documented Mr. Boccella's behavior in incident reports.

[8]    Given the unique facts of this case, there are very few cases that involve analogous fact patterns.

traditional tort principles of but-for and proximate causation" may determine whether GEO bears any responsibility for Mr. Funkhouser's death. *Id.*

11.    Based on a fair reading of the Second Amended Complaint, the Estate alleges that if GEO had developed policies and trained its employees to identify, assess, record, and communicate an inmate's threat of harm to other inmates, then GEO's staff would have communicated or documented the risk of harm that Mr. Boccella posed to other inmates in the Facility—while GEO continued to operate the Facility—and that information would have prevented Delaware County's employees from transferring Mr. Funkhouser into Mr. Boccella's cell. These factual assertions are sufficient to allege that GEO caused the constitutional injury at issue.

12.    Whether intervening events are sufficient to act as a superseding cause of the harm is a question that I cannot resolve at this stage of the proceedings. "Ordinarily, proximate cause cannot be determined on the basis of pleadings but instead requires a factual development at trial." *Est. of Bailey by Oare v. York Cnty.*, 768 F.2d 503, 511 (3d Cir. 1985), *abrogated on other grounds*, *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989). Indeed, without an evidentiary record, I cannot determine that "there is no evidence from which a jury could reasonably find the required proximate, causal nexus between the careless act and the resulting injuries." *Johnson v. City of Philadelphia*, 837 F.3d 343, 352 (3d Cir. 2016) (quotation omitted). Thus, I will deny GEO's motion to dismiss the Estate's *Monell* claim.

13.     I will also deny GEO's motion to dismiss the Estate's negligence claim. Like its *Monell* arguments, GEO contends that it did not owe Mr. Funkhouser any duties once GEO no longer controlled operations at the Facility. But again, the Estate's negligence claims are based on GEO's conduct while it ran the Facility. The fact that the consequences did not materialize until weeks later does not extinguish that duty. Instead, the Parties will have to develop the factual record to determine whether GEO's conduct was the proximate cause of the harm.

14.     Once the Estate's allegations are viewed in the proper context, it becomes clear that GEO's arguments fail. Under Pennsylvania law, "one who has custody of another is under a duty of reasonable care to protect him from injuries at the hands of third persons, within the custodian's control, to whom he has been rendered vulnerable by the custody or manner of custody." *Ammlung v. City of Chester*, 302 A.2d 491, 496 (Pa. Super. Ct. 1973). In addition, some Pennsylvania courts have held that "inmates are analogous to invitees for purposes of determining the duty of care owed by prison officials" and that as "possessors of land," prison officials owe a duty to inmates "to protect them from foreseeable harm." *Cochrane v. Kopko*, 975 A.2d 1203, 1206 (Pa. Commw. Ct. 2009) (citations omitted). Thus, GEO owed a duty to Mr. Funkhouser while he was in its custody. Whether GEO's policies, or lack thereof, deviated from the standard of care during that time is not something that I can resolve on a motion to dismiss, despite GEO's urging.

15.    In addition, like the *Monell* claim, the Estate has included plausible allegations of proximate causation, and there is no evidence before me from which I could determine—as a matter of law—that some other event in the causal chain is a superseding cause of Mr. Funkhouser's death. Under Pennsylvania law, "[a] determination of whether an act is so extraordinary as to constitute a superseding cause is normally one to be made by the jury." *Powell v. Drumheller*, 653 A.2d 619, 624 (Pa. 1995). That determination turns on whether the alleged intervening acts were reasonably foreseeable, something I cannot rule on without the benefit of discovery. *See id.* at 623. For example, the question of whether intervening acts by Wellpath or Delaware County employees were reasonably foreseeable may depend on how GEO, Wellpath, and the County handled the transition of prison operations. Thus, I will not dismiss the Estate's negligence claim on proximate causation grounds, where it is plausible that GEO's alleged failures started the chain of events that led to Mr. Funkhouser's death.

**The Wellpath Defendants' Motion To Stay**

16.    On November 18, 2024, I severed and stayed all the claims asserted against Wellpath, LLC in this matter, in light of the of bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, under Case No. 24-90563. At the time, it did not appear that the Bankruptcy Court had extended the automatic stay to the claims asserted against Kristen Grady, Serene Eaddy, Nina Chychula, and Meghan Gilbert in this matter.

17.    However, on January 14, 2025, the Bankruptcy Court issued an order extending the automatic stay to "any claims or causes of action that have been or may be asserted against ... the Debtors' current or former employees to the extent the Debtors are also named defendants in the underlying lawsuit[.]" (ECF No. 98-1 ¶ 1.) This would include the claims and cross-claims asserted against Ms. Grady, Ms. Eaddy, Ms. Chychula, and Ms. Gilbert.

18.    In addition, the Bankruptcy Court's order extends the stay to any claims or causes of action that have been or may be asserted against any of Wellpath's current or former clients or customers on an interim basis, so that Wellpath can have an opportunity to establish whether any indemnification obligations exist. (*See id.* at ¶¶ 3-4.) For Wellpath's current clients and customers, the stay extends to claims against *their* current or former employees as well. Given the Inmate Health Care Services Management Agreement Between Wellpath LLC And Delaware County, Pennsylvania (ECF No. 92-4, Exhibit B), it appears that Delaware County is a current client or customer of Wellpath. So, the stay extends to claims and cross-claims asserted against Delaware County and its employees—Laura Williams, Michael Moore, Mohammed Fakolee, and Saba Brownell.

19.    Given the breadth of the Bankruptcy Court's order and the impact these stays will have on this matter, the Estate has also requested "that this entire matter be

11

placed in suspense" pending the bankruptcy proceeding. (ECF No. 98 at 3.)[9] Certainly, failing to stay the entire case runs the risk of conducting duplicative discovery, given the fact that the Wellpath and Delaware County Defendants would need to be deposed twice, as they all started off as employees of GEO.

Therefore, it is **ORDERED** as follows:

1.     The GEO Group, Inc.'s Motion To Dismiss Plaintiff's Second Amended Complaint (ECF No. 83) is **DENIED**;

2.     The Wellpath Defendants' Motion To Extend Automatic Stay To Wellpath, LLC's Employees (ECF No. 92) is **GRANTED**;

3.     This case is **STAYED** pending further Order;

4.     In the event the Bankruptcy Court lifts, modifies, or declines to extend further any of the stays of the claims asserted against the Delaware County Defendants or the Wellpath Defendants, those Defendants shall notify me within 28 days of that decision; and

5.     The Second Motion To Extend Deadlines (ECF No. 94) is **DENIED AS MOOT**.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

---

[9]     For its part, GEO did not oppose the Wellpath Defendants' motion to stay the claims asserted against it. Nor did GEO lodge any objection to the Estate's request that I stay the case in full.